IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSSETTS

| | |
|---|---|
| KARI PROSKIN, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>     v.<br><br>FOURSQUARE LABS, INC.<br><br>                              Defendant. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kari Proskin ("Plaintiff"), by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge, against Defendant Foursquare Labs, Inc. ("Foursquare" or "Defendant").

## NATURE OF THE ACTION

1. Foursquare secretly gathers and sells vast amounts of time-stamped, precise geolocation data from consumers' cell phones, and then profits by selling that data to other companies. "[T]ime-stamped [location] data provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (internal quotations and citations omitted).

2. Foursquare's own CEO has acknowledged that "[l]ocation based data is probably the most sensitive PII [personally identifiable information] in the ecosystem — where people move, where phones move, and the correlation of that."

3. Foursquare collects location data from cell phones by using spyware called "Movement SDK," (formerly known as "Pilgrim SDK") which is pre-installed on third party mobile apps.

4. Foursquare then profits by selling or trading this location data.

5. According to the Federal Trade Commission, the surreptitious collection and sale of geolocation data is a violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits "unfair or deceptive acts or practices in or affecting commerce."

6. The Uber ride-sharing app utilized the Movement SDK.

7. Plaintiff Kari Proskin has used the Uber app for years. Therefore, Foursquare obtained and sold Plaintiff's geolocation data, just as it did with all other Uber customers.

8. Plaintiff brings this class action on behalf of herself and all others similarly situated who have had their geolocation data sold by Foursquare without their consent. Plaintiff seeks injunctive relief and non-restitutionary disgorgement of all profits Foursquare obtained by the sale of the geolocation data of Massachusetts residents.

    A.    **The Multibillion-Dollar Market for Cell Phone Location Data**

9. A huge but little-known industry has cropped up around using mobile applications to surveille and monetize people's movements.

10. Mobile apps have all kinds of legitimate reasons for using location data. Map apps need to know where a user is located to give directions. A weather, waves, or wind app checks a user's location to provide relevant meteorological information. A video streaming app might check where a user is located to confirm the user is in a country where it's licensed to stream certain shows.

11. Mobile apps often send a notification asking for permission to access location data. The reasonable inference is that the request is made so that the app can function as

intended. For example, a user of Uber would infer that Uber would need to her location in order to send a car to the correct area.

12. But unbeknownst to users, some of those apps sell or share location data about their users with companies that analyze the data and sell their insights. Companies like real estate firms, hedge funds and retail businesses commonly use the data for their own advertising, analytics, investment strategy, or marketing purposes.

13. As a result, companies that most people have never heard of are hawking access to the location history on consumers' mobile phones. An estimated $16 billion market, the location data industry has many players: collectors, aggregators, marketplaces, and location intelligence firms, all of which boast about the scale and precision of the data that they've amassed.

14. Companies in this industry rely on the fact that the general public, legislators, and most government agencies are not paying attention to what these companies are doing.

15. Companies in this industry typically claim that protecting privacy is at the center of their businesses, and that they never sell information that can be traced back to a person. That claim is false. Occasionally, stories emerge that show just how invasive this industry is. For example, X-Mode, a company that collects location data through apps, was caught selling data from Muslim prayer apps to military contractors. In 2020, another geolocation data broker sold geolocation data to federal agencies for immigration enforcement. In 2021, a Catholic news outlet used location data from another data broker to out a priest who had used the Grindr app and frequented gay bars.

16. The bottom line is that geolocation data can be traced back to a person, and for obvious reasons, is much more valuable and useful to marketers when it is.

**B.     Foursquare:  One of the Founding Players In The Mobile Geolocation Data Market.**

17.     Founded in 2009, Foursquare is one of the largest geolocation data brokers in the industry.

18.     Foursquare did not start out as a geolocation data broker.  In 2009, when Foursquare launched, the iPhone was just over a year old, the App Store had only been around for six months, and location technology was still taking shape.  At that time, Foursquare's founders set out to make a social application that would allow users to "check in" as they visited various places, and easily connect with friends, meet nearby strangers, and explore cities in new ways.  The user location data produced by the check-ins could then be used to generate customized recommendations and a vast database of specific venue locations.

19.     Initially, the company was a success, but in time the company struggled to compete with more dominant social media companies like Facebook and Twitter.

20.     As the era of Foursquare seemed to be coming to an end, Foursquare realized that it still had something valuable: years of user geolocation data.  In 2017, the company pivoted with the creation of its "Pilgrim SDK."

21.     SDKs are a set of prebuilt tools that app developers can use in their own apps.

22.     Pilgrim SDK would function much like Foursquare's original business model, except with one big difference: it automatically checked in users based on their movements.

23.     The hyper-contextual, time-stamped, data collected from users by the Pilgrim SDK allowed Foursquare to offer services as a third-party enterprise tool to some of tech's biggest players, including Uber.

24.     Foursquare later changed the name of "Pilgrim SDK" to "Movement SDK," explaining the company wanted "to align our product names closer to their functionality."

4

25. The Movement SDK uses a combination of GPS, cell, wifi, bluetooth, accelerometer, and time-of-day data to provide location data. It can even capture "precise visits" in larger venues such as malls and airports.

26. Foursquare said that its technology "unlocks locations with precision and in rich detail," and describes itself as "the leading cloud-based location technology platform for unlocking the power of places and movement."

27. Foursquare said that "[w]ith the Movement SDK integration, the data transfer is in real time."

28. The Movement SDK operates whenever a user runs a mobile application that has the Movement SDK installed on it.

29. Foursquare's change in business model from a social media company to a location data broker proved to be a very successful strategy. The company's primary source of revenue now relates to the collection and sale of geolocation data, and its revenue is well over $100 million a year.

30. More than 125,000 developers worldwide have embedded Foursquare's SDK into their apps, including Uber.

    **C.    Foursquare's Data Can Be Used to Identify People and Track Them to Sensitive Locations**

31. Foursquare's data collection includes mobile advertising identifiers (or "MAIDs").

32. The fact that Foursquare collects MAIDs means that the geolocation data that Foursquare collects can easily be linked to the names and home addresses of people associated with the mobile advertising identifier.

33. A MAID is a unique pseudo-anonymous identifier tied to a mobile phone.

34. Mobile phones offer several APIs to developers that allow them to collect data about the phone itself as well as the phone's usage patterns. Both iOS and Android have created unique identifiers that enable data to be pseudo-anonymously tied back to the phone where it was collected. Those identifiers are known as MAIDs.

35. However, in reality, MAIDs do not protect a phone user's identity. The geolocation data industry includes data brokers who advertise services to match MAIDs with "offline" information, such as consumers' names and physical addresses. Companies within this de-anonymization industry often rely on vague euphemisms or jargon to describe their product, including "identity resolution" and "identity graph."

36. For example, one such data broker is BIGDBM, who describes itself as "The Future of Big Data." In 2021, that company's CEO told Motherboard "[w]e have one of the largest repositories of current, fresh MAIDS<>PII in the USA." He went on to add that MAIDs are linked to full name, physical address, and their phone, email address, and IP address if available. The dataset also included other information, "too numerous to list."

37. Other companies claiming to offer a similar service as BIGDBM include FullContact, which says it has 223 billion data points for the U.S., as well as profiles on over 275 million adults in the U.S.

38. The reason why there is such a robust market for de-anonymizing MAIDs is self-evident: deanonymized geolocation data is more valuable to advertisers than anonymized data.

39. The fact that data brokers are selling data that allows companies to match MAIDs with personally identifying information makes a mockery of Foursquare's claims that the truckloads of data about Americans that it collects and sells is anonymous.

40. Moreover, by comparing the time-stamped, latitude and longitude coordinates provided by Foursquare with publicly available map programs, it is possible to identify which

consumers' mobile devices are associated with homes, or other sensitive locations. For example, the location of a mobile device at night likely corresponds to the consumer's home address. Public or other records may identify the name of the owner or resident of a particular address. Indeed, Foursquare cites "residential addresses" as part of its "premium" data that it provides each day.

41. Foursquare employs no technical controls to prohibit its customers from identifying consumers or tracking them to sensitive locations, or alternatively, any such controls are not enforced.

        D.        **Plaintiff's Data Was Collected and Sold By Foursquare**

42. Uber has utilized Foursquare's technology for its app since at least 2016.

43. Around 2016, Uber and Foursquare entered into a global partnership, which has been described as a "big win" for Foursquare, as it means Uber would provide troves of valuable location data that Foursquare could obtain from Uber users.

44. Uber's Privacy Notice discloses that the Uber app collects and shares location data, but does not disclose that it is shared with Foursquare, or that it is shared for the purpose of selling in the geolocation data market.

45. Instead, Uber's Privacy Notice falsely implies that the geolocation data is only collected and shared for app functionality, or matters related to the ride service. For example, Uber claims that the location data is used "to navigate rider pick-ups and order drop-offs, calculate ETAs, and track the progress of rides or deliveries." Similarly, Uber says that location data is used to "match available drivers and delivery persons to users requesting services." Or location data might be used to prevent or detect fraud perpetrated in connection with Uber's ride sharing services. Uber does not tell users that their geolocation data will be distributed and monetized within the shadowy multibillion-dollar market for cell phone location data.

46. Plaintiff has periodically used the Uber mobile application for the last four years, with the last time being approximately February 2023.

47. During the entire period that Plaintiff used the Uber app, it contained Foursquare's geolocation tracking technology.

48. During this same period, it was Foursquare's regular business practice to collect, sell, and profit from the geolocation data of every Uber customer who used the Uber mobile application.

49. Foursquare collected, sold, and profited from Plaintiff's geolocation data.

50. Plaintiff did not know about or consent to Foursquare's conduct.

## PARTIES

51. Plaintiff Kari Proskin is domiciled in Massachusetts, and resides in Pittsfield, Massachusetts.

52. Defendant Foursquare is a Delaware corporation headquartered in New York.

## JURISDICTION AND VENUE

53. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

54. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events that gave rise to this cause of action occurred here.

55. This court has personal jurisdiction over Defendant because a substantial portion of the events giving rise to this cause of action occurred here. Plaintiff is domiciled and suffered her primary injury in this district.

56. Foursquare has had a registered agent for service of process in Boston,

Massachusetts since at least October 2021.

57. As part of its ordinary business practice, Foursquare surreptitiously monitors and tracks the activities of Massachusetts consumers in real-time, including tracking their location for marketing purposes. Foursquare then sells this information to third parties.

58. For the last ten years, Massachusetts has consistently ranked as one of the most prosperous states in the United States, including during the height of the COVID-19 pandemic. Companies have a correspondingly high interest in marketing to Massachusetts consumers, which in turn increases the value of data about those consumers. As a result, Foursquare has derived substantial revenue from the surreptitious collection and sale of data about Massachusetts consumers.

59. Foursquare knowingly obtains data regarding Massachusetts consumers.

60. As a result of its geolocation tracking, Foursquare intentionally identifies Massachusetts consumers, compiles data about Massachusetts consumers, and sells data about Massachusetts consumers.

61. Foursquare's tracking and sale of Massachusetts consumer data is repeated and intentional; it is not random, fortuitous, or attenuated.

## CLASS REPRESENTATION ALLEGATIONS

62. Plaintiff seeks to represent a class defined as all persons in the United States whose data, including but not limited to their geolocation data, was sold by Defendant without their consent (the "Class").

63. Plaintiff also seeks to represent a subclass defined as all Class members who reside in the Commonwealth of Massachusetts whose data, including but not limited to their geolocation data, was sold by Defendant without their consent (the "Massachusetts Subclass").

64. Subject to additional information obtained through discovery, the foregoing class definitions may be modified or narrowed by an amended complaint, or at class certification, including through the use of multi-state subclasses to account for material differences in state law, if any.

65. Members of the Class and Massachusetts Subclass are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class and Massachusetts Subclass number in the millions. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

66. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include but are not limited to whether Defendant's sale of geolocation data without consent constitutes unjust enrichment.

67. The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff's data was sold by Defendant without her consent, and the named Plaintiff suffered injury as a result of Defendant's conduct.

68. Plaintiff is an adequate representative of the Class and Massachusetts Subclass because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

69. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the

resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Unjust Enrichment

70. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

71. Plaintiff brings this claim individually and on behalf of members of the Class and the Massachusetts Subclass against Defendant.

72. Plaintiff and Class members unwittingly conferred a benefit upon Defendant. Defendant acquired valuable personal location information belonging to Plaintiff and Class members which it then sold to other parties without the consent of Plaintiff and Class members. Plaintiff and Class members received nothing from this transaction.  Plaintiff lacks an adequate remedy at law, and pleads this cause of action in the alternative to the extent Plaintiff is required to do so.

73. Defendant has knowledge of such benefits.

74. Defendant has been unjustly enriched in retaining the revenues derived from the sale of Plaintiff's and Class members' data, including their geolocation data.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant did not obtain the

consent of Plaintiff and Class members before selling their data to third parties as described above.

75. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class members for its unjust enrichment, including non-restitutionary disgorgement of its profits.

## COUNT II
### Violation of the Massachusetts Unfair and Deceptive Business Practices Act, Mass. Gen. Laws Ch. 93A *et seq.*

76. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

77. Plaintiff brings this claim individually and on behalf of the members of the Massachusetts Subclass against Defendant.

78. Section 2 of Chapter 93—the Massachusetts Unfair and Deceptive Business Practices Act ("93A")—prevents the use of "unfair or deceptive acts or practices in the conduct of any trade or commerce."

79. It is "the intent of the legislature that in construing" whether an act is deceptive under 93A § 2, "the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended." *See* Mass. Gen. Laws Ann. ch. 93A, § 2.

80. An act or practice is a violation of 93A if it "violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. c. 93A, § 2." 940 CMR 3.16.

81. Section 9 provides: "Any person … who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two … may

12

bring an action in the superior court … for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper … Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of herself and such other similarly injured and situated persons."

82. Pursuant to the definitions codified in Chapter 93A § 1, Defendant is a "person," and Defendant is engaged in "trade" and "commerce" in Massachusetts by engaging in the purchase and sale of Products that directly or indirectly affect the people of Massachusetts.

83. By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in unfair or deceptive acts or practices in the conduct of trade or commerce.

84. Defendant's acts and omissions are material, in that a reasonable person would attach importance to the information and omissions described above and would be induced to act on the information in deciding to use services such as phone applications.

85. Defendant has also committed a violation of 93A predicated on its violations of FTC regulations – specifically, its violation of Section 5 of the FTC Act as interpreted by the Federal Trade Commission.

86. Plaintiff and members of the Massachusetts Subclass were deceived by Defendant's policies and in fact had no idea that Defendant was selling their location data.

87. Plaintiff and members of the Massachusetts Subclass did not consent to Defendant's sale of their location data.

88. Defendant in conjunction with third party phone and internet applications knowingly omitted that Defendant had access to and was selling the location data of Plaintiff and the class.

89. Had Plaintiff and Massachusetts Subclass members known that the Defendant was selling their data, they would either have ceased to use the relevant phone applications or would have requested compensation for the misappropriation and sale of their location data.

90. Plaintiff and Massachusetts Subclass Members were injured as a direct and proximate result of Defendant's breach because Defendant misappropriated and sold the location data of Plaintiff and Massachusetts Subclass members without consent.

91. Plaintiff and members of the Massachusetts Subclass have been harmed by this injury, adverse consequence, and/or loss.

92. 93A represents a fundamental public policy of the Commonwealth of Massachusetts.

93. Foursquare does not have a place of business in Massachusetts and does not have assets in Massachusetts.

94. For each loss, Plaintiff and each member of the Massachusetts Subclass may recover an award of actual damages or twenty-five dollars, whichever is greater.  Ch. 93A § 9(3).

95. Disgorgement of profit derived from an unfair and deceptive act or practice is a permissible damage remedy under G.L. c. 93A, § 9.

96. Accordingly, Plaintiff and the members of the Massachusetts Subclass seek the disgorgement of profits that Defendant derived from the sale of their location data.

97. Because Defendant acted willfully or knowingly, Plaintiff and each member of the Massachusetts Subclass may recover up to three but not less than two times this amount.  In addition, Plaintiff may recover attorneys' fees and costs.

98. Plaintiff and each member of the Massachusetts Subclass may recover an award of actual damages (in this case unlawful profit derived from the sale and trading of location data) or twenty-five dollars, whichever is greater. Ch. 93A § 9(3).

99. Plaintiff and the members of the Massachusetts Subclass may also seek the imposition of an injunction relief which limits and polices Defendant's representations within or reaching Massachusetts. The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff, members of the Massachusetts Subclass, and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff, members of the Massachusetts Subclass, and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

## **RELIEF DEMANDED**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order certifying the nationwide Class and the Massachusetts Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and the Massachusetts Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and the Massachusetts Subclass members;

b. For an order declaring that Defendant's conduct violates the laws referenced herein;

c. For an order finding in favor of Plaintiff, the nationwide Class, and the Massachusetts Subclass on all counts asserted herein;

d. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e. For prejudgment interest on all amounts awarded;

f. For an order of restitution and all other forms of equitable monetary relief;

15

  g. For an order enjoining Defendant from continuing the illegal practices detailed herein and compelling Defendant to undertake a corrective advertising campaign; and

  h. For an order awarding Plaintiff and the Class and Massachusetts Subclass their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims so triable.

Dated: July 24, 2023      Respectfully submitted,


            **BURSOR & FISHER, P.A.**
            Julian C. Diamond (*pro hac vice* forthcoming)
            888 Seventh Avenue
            New York, NY 10019
            Tel: (646) 837-7150
            Fax: (212) 989-9163
            E-Mail: jdiamond@bursor.com

            **BURSOR & FISHER, P.A.**
            Joel D. Smith (BBO No. 712418)
            1990 North California Blvd., Suite 940
            Walnut Creek, CA 94596
            Telephone: (925) 300-4455
            Facsimile: (925) 407-2700
            Email: jsmith@bursor.com

            *Attorneys for Plaintiff*